1    MARC J. FAGEL (Cal. Bar No. 154425)
    MICHAEL S. DICKE (Cal. Bar. No. 158187)
2    ROBERT L. MITCHELL (Cal Bar No. 161354)
3     mitchellr@sec.gov
    ERIN E. SCHNEIDER (Cal. Bar No. 216114)
4     schneidere@sec.gov

5    Attorneys for Plaintiff
    SECURITIES AND EXCHANGE COMMISSION
6    44 Montgomery Street, Suite 2800
7    San Francisco, California 94104
    Telephone: (415) 705-2500
8    Facsimile: (415) 705-2501

9

10            UNITED STATES DISTRICT COURT

11         NORTHERN DISTRICT OF CALIFORNIA

12             OAKLAND DIVISION

13    SECURITIES AND EXCHANGE COMMISSION,    Case No. CV13     0895

14           Plaintiff,

15                   COMPLAINT

16       v.

17    WALTER NG, KELLY NG, BRUCE HORWITZ,
    and THE MORTGAGE FUND, LLC
18

19           Defendants.

20

21       Plaintiff Securities and Exchange Commission (the "Commission") alleges:

22                  **SUMMARY OF THE ACTION**

23       1.      This case involves a multi-million dollar securities fraud perpetrated on investors

24    throughout California, Oregon, and Washington by the father-son team of Walter Ng and Kelly Ng,

25    and their friend, Dr. Bruce Horwitz. For years, the Ngs and Horwitz, a local pediatrician, had

26    managed a real estate fund called R.E. Loans, LLC. In 2007, however, R.E. Loans began to

27    experience significant cash flow problems and the Ngs and Horwitz for the first time were unable to

28    make distributions to their investors. Rather than tell investors about R.E. Loans' precarious financial

condition, Walter Ng and Kelly Ng in late 2007 decided to form a new real estate fund, Mortgage Fund '08, LLC ("MF08") to raise investor money to prop up R.E. Loans. MF08 was owned and managed by The Mortgage Fund, LLC, which in turn was owned and managed by Walter Ng and Kelly Ng.

2.      The Ngs and Horwitz pitched MF08 as a new, conservative investment vehicle that would replicate the success of R.E. Loans by investing in commercial real estate loans secured by deeds of trust. In reality, MF08 was simply a way for the Ngs to get money into R.E. Loans to continue the illusion that R.E. Loans was profitable. The Ngs and Horwitz from December 2007 through June 2009 raised more than $85 million for MF08, a significant percentage of which the Ngs promptly paid out to investors in R.E. Loans.

3.      In 2008, both R.E. Loans and MF08 experienced dramatic and significant loan delinquencies as borrowers became unable to pay their loans. Rather than tell investors about the rapidly increasing delinquencies, Walter Ng, Kelly Ng, and Horwitz repeatedly lied about R.E. Loans' and MF08's deteriorating performance in order to continue raising money for MF08 – and ultimately, R.E. Loans. All three of them consistently touted both funds as strong, safe, and a fantastic success. In reality, by the end of 2008, more than half of R.E. Loans' and MF08's loan portfolios were delinquent. Because they believed the lies the Ngs and Horwitz told them, investors continued to pour money into MF08 well into 2009. Ultimately, both R.E. Loans and MF08 went into bankruptcy and investors are unlikely to recover their investments.

4.      The Commission seeks an order enjoining Walter Ng, Kelly Ng, their advisory entity The Mortgage Fund, LLC, and Horwitz from future violations of the securities laws. It also seeks an order requiring all Defendants to disgorge ill-gotten gains with prejudgment interest and to pay civil monetary penalties.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGMENT

5.      The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)], Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)], and Sections 209 and 214 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-9

SEC v. NG, ET AL.
COMPLAINT

and 80b-14].

6.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and Sections 209 and 214 of the Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14].

7.     Venue is proper in this District pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. Defendants Walter Ng, Kelly Ng, and Horwitz reside in the Northern District of California. Defendant The Mortgage Fund's principal place of business is in the Northern District of California. Additionally, a substantial portion of the acts or transactions constituting violations of the federal securities laws occurred in this District.

8.     Assignment to the Oakland Division is appropriate pursuant to Civil Local Rules 3-2(c) and 3-2(d) because acts and omissions giving rise to the Commission's claims occurred, among other places in this District, in Contra Costa County.

## DEFENDANTS

9.     Walter J. Ng, age 83, resides in Lafayette, California and has managed investments secured by deeds of trust for more than 52 years. During the relevant period, he served as one of the managing members of two companies, B-4 Partners, LLC, which managed real estate fund R.E. Loans, and The Mortgage Fund, which was the investment adviser to MF08. In testimony before the Commission's staff, Walter Ng asserted his Fifth Amendment rights and refused to answer the staff's questions about his role in and management of R.E. Loans and MF08.

10.     Kelly W. Ng, age 56, resides in Orinda, California, and served with his father, Walter Ng, as a managing member of The Mortgage Fund, which was the investment adviser to MF08. He has maintained a California real estate broker's license since 1980. He also served as Vice President of Bar-K, Inc., a California corporation that serviced the loan portfolios for both R.E. Loans and MF08. In testimony before the Commission's staff, Kelly Ng asserted his Fifth Amendment rights and refused to answer the staff's questions about his role in R.E. Loans and his role in and management of MF08.

11.     Bruce A. Horwitz, age 75, resides in Orinda, California, and served with Walter Ng as a managing member of B-4 Partners, which managed R.E. Loans. Horwitz also has been a licensed pediatrician for more than 30 years. Horwitz met with several prospective investors in MF08 to convince them it was a good, safe investment. In testimony before the Commission's staff, Horwitz asserted his Fifth Amendment rights and refused to answer the staff's questions about his role in and management of R.E. Loans, as well as what he told prospective investors about investing in MF08.

12.     The Mortgage Fund LLC is a California limited liability company formed by Walter Ng and Kelly Ng in 2007 that owned and served as the investment adviser to MF08. The Mortgage Fund was responsible for making investment decisions for MF08. MF08 compensated The Mortgage Fund by paying it, on a monthly basis, 1% per year of the unpaid principal balance owed to MF08 by its borrowers. During the relevant period, Walter Ng owned 10% and Kelly Ng owned 90% of The Mortgage Fund. Walter Ng and Kelly Ng were the sole managing members of The Mortgage Fund.

### OTHER RELEVANT ENTITIES

13.     MF08 is a Delaware limited liability company formed in 2007 by Walter Ng and Kelly Ng. MF08's offering materials claimed it would invest in conservatively underwritten commercial real estate loans secured by deeds of trust. From December 2007 through June 2009, it raised more than $85 million from hundreds of investors located in California and other states. The majority of these investors had invested in the Ngs' predecessor fund, R.E. Loans. MF08 issued promissory notes to investors for five or six year terms and promised to pay on a quarterly basis at least 8% per year in interest on those notes.

14.     R.E. Loans is a California limited liability company established in 2002. Investors in R.E. Loans initially held LLC interests but in late 2007 exchanged their interests for promissory notes similar to those issued by MF08. At its peak in 2007, R.E. Loans had more than $700 million in outstanding commercial real estate loans and thousands of investors.

15.     B-4 Partners is a California limited liability company which served as R.E. Loans' managing member and was responsible for making investment decisions for R.E. Loans. Walter Ng served as a managing member of B-4 Partners during the relevant period. Horwitz also served as a managing member of B-4 Partners until December 2008. R.E. Loans on a monthly basis paid B-4

1  Partners a management fee of 1% per year of the unpaid principal balance of R.E. Loans' outstanding

2  loans.

3                                **FACTUAL ALLEGATIONS**

4       **A.      Background – R.E. Loans**

5       16.     In 2002, Walter Ng and Horwitz formed R.E. Loans. Its business was to make initial,

6  high interest rate loans to real estate projects and developers who would repay them when more

7  traditional lenders refinanced the projects. The loans were secured by deeds of trust. B-4 Partners

8  was the managing member of R.E. Loans, and was owned by Walter Ng, Horwitz, Kelly Ng, and

9  Walter Ng's other son. Walter Ng and Horwitz served as B-4 Partners' managing members, and were

10 responsible for making investment decisions for R.E. Loans and for deciding when and how to make

11 investor distributions. For the most part, R.E. Loans did not obtain independent, third party

12 appraisals on the properties it lent money on – it instead relied on a value determined by Kelly Ng or

13 by Walter Ng's other son. Neither of the Ng brothers has ever been licensed as a commercial real

14 estate appraiser.

15      17.     Walter Ng and Horwitz consistently touted R.E. Loans as highly liquid and told

16 investors they could get back money whenever they wanted. From approximately 2002 through 2006,

17 R.E. Loans raised hundreds of millions of dollars from thousands of investors which allowed it to

18 repay investors on demand. R.E. Loans regularly paid out millions of dollars to investors each year.

19 For example, R.E. Loans in 2006 raised approximately $308 million from investors and distributed

20 back to investors approximately $177 million. In the first six months of 2007, R.E. Loans raised

21 approximately $86 million from investors, and distributed back to investors approximately $77

22 million. The ability to get cash whenever they wanted was important to many R.E. Loans investors in

23 deciding to invest. During 2007, however, R.E. Loans began to experience cash flow difficulties

24 which greatly reduced R.E. Loans' ability to make investor distributions.

25      **B.      R.E. Loans' Cash Flow Difficulties**

26      18.     In early 2007, R.E. Loans decided to convert its existing investors' LLC interests in

27 R.E. Loans to debt. As part of that process, R.E. Loans in April 2007 stopped accepting new investor

28 money. It did not, however, stop making distributions to investors, and by June 30, 2007, R.E. Loans

1   had depleted its cash to approximately $1 million (down from approximately $55 million as of

2   January 1, 2007). At this time, R.E. Loans was highly illiquid because it, among other things, was

3   contractually obligated to loan its borrowers another $105 million.

4      19.    In an effort to obtain more cash to satisfy its obligations to borrowers and continue

5   making distributions to investors, R.E. Loans in July 2007 obtained a $50 million line of credit from a

6   large commercial lender. Walter Ng signed the line of credit on behalf of R.E. Loans. Shortly after

7   the loan closed, Walter Ng drew down approximately $43 million from the line of credit to make

8   payments to himself, various affiliated entities, and investors. These payments significantly depleted

9   the line of credit. The line of credit also imposed on R.E. Loans numerous financing and operating

10  restrictions, including that R.E. Loans must route all borrower payments into a lockbox that the lender

11  controlled. The lender used these payments to pay down the line of credit and then, under certain

12  circumstances, would allow R.E. Loans to re-borrow any needed funds.

13     20.    In approximately August 2007, R.E. Loans began experiencing a slowdown in

14  borrower payments. This slowdown, combined with R.E. Loans' decision to stop accepting investor

15  money, as well as the cash flow restrictions imposed upon it by the large commercial lender, made it

16  difficult for R.E. Loans to meet its ongoing borrower commitments and continue making distributions

17  to investors. Investors continued, however, to clamor for distributions.

18     **C.    Formation and Marketing to Investors of MF08**

19     21.    Desperate for cash, Walter Ng and his son Kelly Ng decided to launch a new fund –

20  MF08 – which they claimed was a new investment opportunity managed by their advisory entity, The

21  Mortgage Fund. In reality, the Ngs immediately began siphoning off whatever money they raised for

22  MF08 to pay R.E. Loans' expenses and make distributions to R.E. Loans' investors.

23     22.    During the relevant period, Walter Ng and Kelly Ng distributed to prospective

24  investors a letter dated November 2007 which announced the formation of MF08 and attached,

25  among other things, MF08's Confidential Private Offering Memorandum and Secured Promissory

26  Note Purchase Agreement ("Offering Materials"). Both Walter Ng and Kelly Ng signed the

27  November 2007 letter. MF08's Offering Materials promoted it as a new opportunity to invest in

28  commercial real estate loans secured by deeds of trust. Beginning in December 2007, MF08 investors

received promissory notes with five or six year terms that guaranteed at least 8% interest per year, payable on a quarterly basis. Walter Ng and Kelly Ng consistently marketed the notes as investments offering superior returns. The Ngs also touted MF08 as the successor to R.E. Loans.

23. MF08's Offering Materials authorized it to buy loans from R.E. Loans as long as the loans met certain requirements. For example, MF08 had to purchase loans from R.E. Loans at fair market value. Moreover, any loans purchased from R.E. Loans could not be in default and had to be fully performing. MF08 could enter into related party loans only if they did not exceed 20% of MF08's assets.

24. MF08 was owned and managed by The Mortgage Fund, which in turn was owned and managed by Walter Ng and Kelly Ng. The Mortgage Fund was responsible for making investment decisions for MF08. MF08 compensated The Mortgage Fund by paying it on a monthly basis a management fee of 1% per year of the unpaid principal balance borrowers owed to MF08. MF08 paid The Mortgage Fund management fees out of the funds it raised from investors. Beginning in 2008 and continuing through 2010, Walter Ng withdrew at least $94,000 and Kelly Ng withdrew at least $140,000 of those management fees from The Mortgage Fund.

25. MF08, like R.E. Loans before it, used a related entity – Bar-K, Inc. – to service the loans. Bar-K was partially owned by Kelly Ng, who served as its Vice President. Bar-K was located in the same office building as MF08 and employed several people responsible for monitoring and recording the performance of the loans, allocating interest payments to the correct loans, and initiating foreclosure proceedings when needed.

26. MF08 ultimately raised more than $85 million from hundreds of investors, a significant majority of whom previously had invested in R.E. Loans. MF08's investors were located throughout California, Oregon, and Washington. Most of MF08's investors reside in the San Francisco, California Bay Area.

**D.   The Scheme to Misappropriate MF08 Investor Money for R.E. Loans**

27. As discussed above, MF08's Offering Materials told investors it would invest in commercial loans secured by deeds of trust. Rather than make these investments, however, Walter Ng and Kelly Ng almost immediately began transferring millions of dollars raised in MF08 into R.E.

Loans. From December 2007 through March 2008, they transferred approximately $39 million to R.E. Loans, which R.E. Loans used to pay its obligations and make distributions to its investors.

28.     Walter Ng and Kelly Ng from the beginning viewed MF08 as a way to get cash into R.E. Loans. For example, Kelly Ng in October 2007 emailed an R.E. Loans investor telling him not to worry about R.E. Loans' viability because the "new capital" coming in from MF08 would provide liquidity. In July 2008, a Bar-K employee emailed R.E. Loans' commercial lender to tell it that Walter Ng didn't want MF08 to make any new loans until he took care of the R.E. Loans investors' requests for distributions. In August 2008, on Walter Ng's behalf, Walter Ng's other son emailed R.E. Loans' commercial lender to ask for more funds because MF08 was not raising money as quickly as investors were asking for distributions from R.E. Loans.

### Walter Ng and Kelly Ng First Directed MF08 To Make Unauthorized and Undisclosed Loans to R.E. Loans

29.     MF08's books and records initially characterized the $39 million Walter Ng and Kelly Ng transferred to R.E. Loans as a series of unsecured loans. For example, approximately $11 million of the funds Walter Ng and Kelly Ng transferred in December 2007 were recorded in R.E. Loans' financial statements as a liability titled Due to Mortgage Fund '08, LLC. There is no written loan agreement between MF08 and R.E. Loans for those transfers. MF08's internal accounting records, however, calculated a 10% interest payment on the funds Walter Ng and Kelly Ng transferred to R.E. Loans. At the time MF08 began this massive cash transfer to R.E. Loans in December 2007, R.E. Loans had only approximately $1.2 million in cash and other liquid assets.

30.     The table below shows the funds that MF08, at both Walter Ng's and Kelly Ng's direction, transferred to R.E. Loans. Walter Ng and Kelly Ng first transferred the funds from MF08 to B-4 Partners and then transferred, or directed the transfer of, the funds from B-4 Partners to R.E. Loans.

| | | | |
|---|---|---|---|
| 12/4/2007 - $2,282,157 | 12/12/2007 - $2,404,912 | 12/14/2007 - $875,000 | 12/14/2007 - $4,378,591 |
| 12/19/2007 - $1,144,875 | 12/20/2007 - $188,000 | 1/4/2008 - $3,500,000 | 1/4/2008 - $1,000,000 |
| 1/10/2008 - $4,500,000 | 1/14/2008 - $5,888,664 | 1/29/2008 - $1,773,730 | 2/1/2008 - $4,609,077 |

| 2/4/2008 - $1,700,000 | 2/6/2008 - $1,292,430 | 2/13/2008 - $950,000 | 2/20/2008 - $500,000 |
|---|---|---|---|
| 2/22/2008 - $336,000 | 2/28/2008 - $600,000 | 3/3/2008 - $1,500,000 | Total: $39,423,436 |

31.     These loans from MF08 to R.E. Loans were not authorized by MF08's Offering Materials nor were they disclosed to MF08's investors.  As discussed above, MF08's Offering Materials provided that MF08 would invest in commercial real estate loans secured by deeds of trust. Nowhere do the Offering Materials disclose that MF08 would use investor money to make general, unsecured business loans to R.E. Loans so that R.E. Loans could pay its obligations and make investor distributions.  Moreover, MF08's Offering Materials told investors that MF08 could make related party loans (for commercial real estate projects) only if those loans didn't exceed 20% of its assets.  Here, the $39 million in loans to R.E. Loans comprised nearly 100% of MF08's assets. Finally, MF08's loans to R.E. Loans were not secured by deeds of trust.  Accordingly, while investors believed they were investing money in an independent entity making commercial real estate loans secured by deeds of trust, Walter Ng and Kelly Ng did nothing more than divert that money into R.E. Loans, their failing, illiquid fund, for the purpose of keeping R.E. Loans afloat and paying off R.E. Loans' investors.

32.     Walter Ng and Kelly Ng knew, or were reckless in not knowing, that the loans they made from MF08 to R.E. Loans were not authorized by MF08's Offering Materials and that they did not disclose those loans to MF08's investors.

**Walter Ng and Kelly Ng Later Transferred Three Real Estate Loans From R.E. Loans to MF08**

33.     In March 2008, R.E. Loans' commercial lender learned that R.E. Loans had borrowed approximately $39 million from MF08.  The commercial lender told R.E. Loans that this debt was prohibited by the terms of the line of credit.  In an attempt to remedy this problem and extinguish the debt, R.E. Loans decided to transfer to MF08 $39 million of its commercial real estate loans.

34.     In approximately April 2008, Walter Ng and Kelly Ng began to take steps to obtain three loans from R.E. Loans to justify the $39 million MF08 already had transferred to R.E. Loans. These loans were commonly known as Alligator Bay ($7,953,435), Peachtree ($18,520,000), and T&J

9

1  Saucepan ($12,950,000). However, the borrowers on all three of these loans had stopped making

2  payments in 2007. Additionally, R.E. Loans' commercial lender had deemed all of these loans

3  ineligible for R.E. Loans to borrow against because they were not performing in accordance with the

4  terms of the original loan agreements. Despite these facts, Kelly Ng and Walter Ng both signed

5  purchase agreements between MF08 and R.E. Loans which falsely stated that the loans were not

6  delinquent, were not in default, and were fully performing.

7       35.    MF08's purchases of these loans from R.E. Loans, like the earlier transfers it made to

8  R.E. Loans, were not authorized by MF08's Offering Materials. MF08's Offering Materials told

9  investors that MF08 could purchase loans from R.E. Loans only if they were priced at fair market

10 value, not in default, and were fully performing. Here, the borrowers on all three of the loans R.E.

11 Loans transferred to MF08 had stopped making payments in 2007.

12      36.    Both Walter Ng and Kelly Ng knew, or were reckless in not knowing, that the three

13 loans MF08 received to make up for the $39 million MF08 transferred to R.E. Loans did not comply

14 with the terms disclosed in MF08's Offering Materials. They also knew, or were reckless in not

15 knowing, that the borrowers on these loans had stopped making payments in 2007.

16      **E.    Walter Ng, Kelly Ng, and Horwitz Made False Statements to Continue Luring
              Investors Into MF08**

17

18      37.    Walter Ng's and Kelly Ng's scheme to raise money in MF08 to pay off R.E. Loans

19 investors depended on their ability to convince investors to invest in MF08. The Ngs, as well as

20 Horwitz, lured investors into MF08 in part by consistently touting R.E. Loans' performance. R.E.

21 Loans' performance, as well as the ability to withdraw cash from R.E. Loans at any time, was a

22 critical factor for many investors who decided to invest in MF08. Investors viewed MF08 as the

23 successor to R.E. Loans and wanted to invest in MF08 because R.E. Loans had performed so well.

24      38.    Walter Ng, Kelly Ng, and Horwitz explicitly linked R.E. Loans and MF08 together

25 when they solicited investors for MF08. For example, all three of them promoted MF08 as the

26 successor to R.E. Loans and repeatedly told investors that MF08 followed the same safe, profitable

27 investment strategy that R.E. Loans did. All three of their names appear on an R.E. Loans investor

28 letter dated February 18, 2008 that included a flyer for MF08, which they characterized as "almost

1 identical" to R.E. Loans. All three of their names also appear on a March 2008 R.E. Loans investor

2 letter which praises R.E. Loans' strong asset base and notes that they are currently accepting new

3 investments in MF08. Additionally, Walter Ng and Kelly Ng touted in MF08's Offering Materials

4 their multi-year track record with R.E. Loans.

5      39.    In 2008, both R.E. Loans and MF08 began to experience significant and dramatic

6 borrower defaults. According to the monthly certificates R.E. Loans prepared for its commercial

7 lender, and that Walter Ng signed, the percentage of R.E. Loans' loans that were either delinquent or

8 in default increased from 19% in January 2008 to 48% in August 2008. The percentage of MF08's

9 loans that were more than thirty (30) days delinquent increased from 16% in March 2008 to 74% by

10 mid-June 2008. Borrower delinquencies significantly impacted both R.E. Loans and MF08 because

11 both funds depended on borrower payments to make quarterly interest payments to their investors.

12      40.    Despite the disintegrating loan portfolios, Walter Ng, Kelly Ng, and Horwitz

13 continued to solicit investors for MF08 well into 2009 and repeatedly assured investors in R.E. Loans

14 and MF08 that the funds were performing well and that the underlying loans were safe and secure.

15      41.    In January 2008, for example, Walter Ng signed on behalf of The Mortgage Fund a

16 letter to prospective MF08 investors stating that MF08 was ideal for people who wanted retirement

17 income and high earnings. Walter Ng knew, or was reckless in not knowing, that this statement was

18 materially false and misleading because at that time, MF08 had made only approximately $11 million

19 in unsecured loans to R.E. Loans, which was experiencing difficulties paying its obligations and

20 making distributions to its investors.

21      42.    In March 2008, Walter Ng and Kelly Ng signed a letter to MF08 investors stating that

22 MF08's asset base was strong and secure in spite of the current disruption in the mortgage market.

23 The letter further stated that all of MF08's loans were secured by first deeds of trust and that they

24 were using their experience and expertise to make good loans, protect the loans, and collect the

25 principal and interest. Walter Ng and Kelly Ng knew, or were reckless in not knowing, that these

26 statements were materially false and misleading because at that time MF08 had only made

27 approximately $39 million in unsecured loans to R.E. Loans, which was having difficulties paying its

28 obligations and making distributions to investors. They also knew, or were reckless in not knowing,

1 | that by this time approximately 28% of the loans in R.E. Loans' investment portfolio were either

2 | delinquent or in default, and that MF08's loans to R.E. Loans were not secured by deeds of trust.

3 |      43.    In approximately March 2008, Horwitz told a prospective MF08 investor that MF08

4 | was very safe, that the chance of failure was slim to none, and that no investor had ever lost money.

5 | Horwitz also told the investor he and his family had invested in MF08. Horwitz knew, or was

6 | reckless in not knowing, that these statements were materially false and misleading because by that

7 | time, MF08 had only made approximately $39 million in unsecured loans to R.E. Loans, which was

8 | having difficulties paying its obligations and making investor distributions. He also knew, or was

9 | reckless in not knowing, that by this time approximately 28% of the loans in R.E. Loans' investment

10 | portfolio were either delinquent or in default. Moreover, neither he nor his family invested in MF08.

11 |      44.    In approximately June 2008, Horwitz told a prospective MF08 investor that MF08 was

12 | very secure. This investor told Horwitz she couldn't afford to lose the money because she needed it

13 | for retirement. Horwitz knew, or was reckless in not knowing, that his statement was materially false

14 | and misleading because by this time, 16% of MF08's loans were more than thirty (30) days late on

15 | their payments and at least one loan had been in default since 2007.

16 |      45.    In approximately June 2008, R.E. Loans and MF08 held an investor dinner in

17 | Oakland, California's Chinatown. Walter Ng told investors at this dinner that both R.E. Loans and

18 | MF08 were performing well. Horwitz told investors at this dinner that investing in MF08 was safe.

19 | Both Walter Ng and Horwitz knew, or were reckless in not knowing, that their statements were

20 | materially false and misleading because by that time, approximately 35% of R.E. Loans' loans were

21 | either delinquent or in default and 16% of MF08's loans were more than thirty (30) days late on their

22 | payments, including one loan that had been in default since 2007.

23 |      46.    As discussed above, the Ngs and Horwitz lured investors into MF08 in part by

24 | consistently touting R.E. Loans' performance. For example, on July 21, 2008, Walter Ng, Kelly Ng,

25 | and Horwitz signed a letter to R.E. Loans' investors stating that R.E. Loans continued to perform

26 | well. Walter Ng, Kelly Ng, and Horwitz knew, or were reckless in not knowing, that this statement

27 | was materially false and misleading because by that time, approximately 39% of R.E. Loans' loans

28 | were either delinquent or in default. Horwitz drafted this letter and Walter Ng reviewed and edited it.

47. Also on July 21, 2008, Walter Ng and Kelly Ng signed a letter to MF08 investors stating that the first six months of MF08 had been a fantastic success and that MF08 had sound loans with strong equity. Walter Ng and Kelly Ng knew, or were reckless in not knowing, that these statements were materially false and misleading because by that time, approximately 74% of MF08's loans were more than thirty (30) days late on their payments and one loan had been in default since 2007.

48. In approximately August 2008, Horwitz told a prospective MF08 investor that default in MF08 was unlikely because MF08's strategy was safe and similar to R.E. Loans' strategy. Horwitz, knew, or was reckless in not knowing, that this statement was materially false and misleading because, for instance, by that time approximately 39% of R.E. Loans' loans were either delinquent or in default and approximately 74% of MF08's loans were delinquent on their payments. MF08 was dependent on its borrowers making payments on time so that it in turn could pay its investors the quarterly interest it owed them.

49. On approximately November 3, 2008, Walter Ng, Kelly Ng, and Horwitz signed a letter to R.E. Loans' investors stating that R.E. Loans was still a strong, safe, and conservative investment. Walter Ng, Kelly Ng, and Horwitz knew, or were reckless in not knowing, that this statement was materially false and misleading because, for instance, by that time at least 48% of R.E. Loans' loans were either delinquent or in default. Horwitz drafted this letter and Walter Ng reviewed and edited it.

50. Several R.E. Loans investors invested in MF08 after receiving or hearing the false statements about R.E. Loans' performance. Additionally, some MF08 investors made additional investments in MF08 after receiving or hearing the false statements about MF08's performance.

F.      **Walter Ng's, Kelly Ng's, and Horwitz's Knowledge About How the Loans Were Performing**

51. Walter Ng, Kelly Ng, and Horwitz knew, or were reckless in not knowing, how the loans in R.E. Loans' and MF08's portfolios were performing. Bar-K, the loan servicer, was located in the same building as R.E. Loans and MF08. Kelly Ng was Vice President of Bar-K. Bar-K employees kept computerized records of borrower payments which were readily accessible to Walter

1  Ng, Kelly Ng, and Horwitz. Bar-K employees monitored payments so closely that they began

2  sending out late notices if borrowers were fifteen days late. Bar-K employees also kept manual notes

3  about the progress of the loans on white cards that they maintained in unlocked file cabinets. Walter

4  Ng, Kelly Ng, and Horwitz regularly looked at these white cards. Walter Ng, Kelly Ng, and Horwitz

5  also regularly asked Bar-K employees questions about how the loans were performing.

6       52.    After R.E. Loans obtained its $50 million line of credit in July 2007, a Bar-K

7  employee on a monthly basis provided Walter Ng and Kelly Ng with aging reports showing the

8  payment history of each loan and identifying which loans were delinquent.

9       53.    During the relevant period, Walter Ng routinely signed reports for R.E. Loans'

10  commercial lender that detailed the performance of the loans and specifically stated what percentage

11  was delinquent and/or in default.

12      54.    According to a February 2008 R.E. Loans investor letter on which Walter Ng, Kelly

13  Ng, and Horwitz's names appear, the Ngs and Horwitz originated, retained, and serviced all of R.E.

14  Loans' loans and kept a "close watch" on them.

15      **G.    Walter Ng, Kelly Ng, and Horwitz Profited From the Scheme to Use MF08**

16          **Investor Money to Prop Up R.E. Loans**

17      55.    Beginning in 2008 and continuing through 2010, Walter Ng withdrew from The

18  Mortgage Fund at least $94,000 of the management fees paid by MF08. Beginning in December

19  2007 and continuing through June 2009, Walter Ng also withdrew from B-4 Partners, the manager of

20  R.E. Loans, at least $506,000.

21      56.    Beginning in 2008 and continuing through 2010, Kelly Ng withdrew from The

22  Mortgage Fund at least $140,000 of the management fees paid by MF08. Beginning in December

23  2007 and continuing through June 2009, Kelly Ng also withdrew from B-4 Partners, the manager of

24  R.E. Loans, at least $456,000. During the same time, he also withdrew at least $90,000 from R.E.

25  Loans.

26      57.    Beginning in December 2007 and continuing through June 2009, Horwitz withdrew

27  from B-4 Partners, the manager of R.E. Loans, at least $167,000. During the same time, he also

28  withdrew from his and his family's investment accounts with R.E. Loans at least $870,000.

SEC v. NG, ET AL.
COMPLAINT

## FIRST CLAIM FOR RELIEF

### *Fraud by Investment Advisers in Advising Clients*
*(Violation of Sections 206(1) & (2) of the Advisers Act against Walter Ng, Kelly Ng, and The Mortgage Fund and Aiding and Abetting against Walter Ng and Kelly Ng)*

58.    The Commission realleges and incorporates by reference Paragraphs 1 through 57.

59.    By engaging in the acts and conduct alleged above, Walter Ng, Kelly Ng, and The Mortgage Fund, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or of the mails, and while engaged in the business of advising others for compensation as to the advisability of investing in, purchasing, or selling securities: (a) with scienter employed devices, schemes, and artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients.

60.    By reason of the foregoing, Walter Ng, Kelly Ng, and The Mortgage Fund have violated and, unless restrained and enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

61.    In addition, Walter Ng and Kelly Ng knowingly provided substantial assistance to The Mortgage Fund's violations of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) & (2)] and therefore each is liable as an aider and abettor pursuant to Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)]. Unless restrained and enjoined, Walter Ng and Kelly Ng will continue to violate and aid and abet violations of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

## SECOND CLAIM FOR RELIEF

### *Fraud in the Purchase or Sale of Securities*
*(Violation of Exchange Act Section 10(b) and Rule 10b-5 Against Walter Ng and Kelly Ng)*

62.    The Commission realleges and incorporates by reference Paragraph Nos. 1 through 57, above.

63.    By engaging in the conduct described above, Walter Ng and Kelly Ng, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, or of a facility of a national security exchange, with scienter:  (1) employed devices, schemes, or artifices to defraud; (b) made untrue statements of

15

1  material facts or omitted to state material facts necessary in order to make the statements made, in the

2  light of the circumstances under which they were made, not misleading; and (c) engaged in acts,

3  practices, or courses of business which operated or would operate as a fraud or deceit upon other

4  persons, including purchasers and sellers of securities.

5         64.    By reason of the foregoing, Walter Ng and Kelly Ng have violated and, unless

6  restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C.

7  § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8  **THIRD CLAIM FOR RELIEF**

9  *Fraud in the Offer or Sale of Securities*
*(Violation of Section 17(a) of the Securities Act Against Walter Ng and Kelly Ng)*

10        65.    The Commission realleges and incorporates by reference Paragraph Nos. 1 through 57,

11  above.

12        66.    By engaging in the acts and conduct alleged above, Walter Ng and Kelly Ng, directly

13  or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or

14  communication in interstate commerce or by use of the mails: (a) with scienter employed devices,

15  schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of

16  material fact or by omitting to state a material fact necessary in order to make statements made, in the

17  light of the circumstances under which they were made, not misleading; and (c) engaged in

18  transactions, practices, or courses of business which operated or would operate as a fraud or deceit

19  upon the purchasers.

20        67.    By reason of the foregoing, Walter Ng and Kelly Ng have violated and, unless

21  restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C.

22  § 77q(a)].

23  **FOURTH CLAIM FOR RELIEF**

24  *Fraud in the Purchase or Sale of Securities*
*(Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Against Horwitz)*

25        68.    The Commission realleges and incorporates by reference Paragraph Nos. 1 through 57,

26  above.

27        69.    By engaging in the conduct described above, Horwitz, directly or indirectly, in

28

16

1   connection with the purchase or sale of securities, by the use of means or instrumentalities of

2   interstate commerce, or the mails, with scienter, made untrue statements of material facts or omitted

3   to state material facts necessary in order to make the statements made, in the light of the

4   circumstances under which they were made, not misleading.

5          70.     By reason of the foregoing, Horwitz has violated and, unless restrained and enjoined,

6   will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b)

7   thereunder [17 C.F.R. § 240.10b-5(b)].

8   **FIFTH CLAIM FOR RELIEF**

    *Fraud in the Offer or Sale of Securities*

9   *(Violation of Section 17(a)(2) of the Securities Act Against Horwitz)*

10          71.     The Commission realleges and incorporates by reference Paragraph Nos. 1 through 57,

11   above.

12          72.     By engaging in the acts and conduct alleged above, Horwitz, directly or indirectly, in

13   the offer or sale of securities, by use of the means or instruments of transportation or communication

14   in interstate commerce or by use of the mails obtained money or property by means of untrue

15   statements of material fact or by omitting to state a material fact necessary in order to make

16   statements made, in the light of the circumstances under which they were made, not misleading.

17          73.     By reason of the foregoing, Horwitz has violated and, unless restrained and enjoined,

18   will continue to violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

19   **PRAYER FOR RELIEF**

20       WHEREFORE, the Commission respectfully requests that this Court:

21                           I.

22       Permanently enjoin Walter Ng and Kelly Ng from directly or indirectly violating, or aiding

23   and abetting violations of, Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) & (2)],

24   Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15

25   U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; permanently enjoin The

26   Mortgage Fund from directly or indirectly violating Sections 206(1) and (2) of the Advisers Act [15

27   U.S.C. § 80b-6(1) & (2)]; and permanently enjoin Horwitz from directly or indirectly violating

28

1 | Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)] and Section 10(b) of the Exchange Act

2 | [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

3 | II.

4 | Order Walter Ng, Kelly Ng, Horwitz, and The Mortgage Fund to disgorge any wrongfully

5 | obtained benefits, including prejudgment interest;

6 | III.

7 | Order Walter Ng and Kelly Ng to pay a civil penalty pursuant to Section 209 of the Advisers

8 | Act [15 U.S.C. § 80b-9], Section 20(d)(1) of the Securities Act [15 U.S.C. § 77t(d)(1)], and Section

9 | 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; order The Mortgage Fund to pay a civil

10 | penalty pursuant to Section 209 of the Advisers Act [15 U.S.C. § 80b-9]; and order Horwitz to pay a

11 | civil penalty pursuant to Section 20(d)(1) of the Securities Act [15 U.S.C. § 77t(d)(1)] and Section

12 | 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

13 | IV.

14 | Retain jurisdiction of this action in accordance with the principles of equity and the Federal

15 | Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that

16 | may be entered, or to entertain any suitable application or motion for additional relief within the

17 | jurisdiction of this Court; and

18 | V.

19 | Grant such other and further relief as this Court may determine to be just and necessary.

20 | DATED: February 28, 2013                    Respectfully Submitted,

21 |

22 |

23 | _____

24 | Erin E. Schneider
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

25 |

26 |

27 |

28 |